578 A.2d 563

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF ENVIRONMENTAL RESOURCES, Petitioner**

**v.**

**The CITY OF HARRISBURG, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 13, 1989.

Decided June 26, 1990.

578

M. Dukes Pepper, Jr., with him, Martin H. Sokolow, Jr. and Mary Martha Truschel, Asst. Counsel, for petitioner.

Howard J. Wein, with him, Kathleen Cummings and William A.K. Titelman, Klett, Lieber, Rooney & Schorling, Pittsburgh, for respondent.

Before CRUMLISH, Jr., President Judge, and CRAIG, DOYLE, COLINS, PALLADINO, McGINLEY and SMITH, JJ.

COLINS, Judge.

The Department of Environmental Resources (DER) petitions for review of an opinion and order[1] of the Environmental Hearing Board (Board), dated October 6, 1988, which granted in part and denied in part the City of Harrisburg's (City) motion to limit issues in connection with an appeal presently pending before the Board.

This case has its genesis in a decision by DER, dated March 2, 1988, denying the City's request for water quality certification under Section 401 of the Federal Water Pollution Control Act, commonly referred to as the Clean Water Act (CWA), 33 U.S.C. § 1341.[2] The City sought certification for a proposed hydroelectric dam to be constructed across the Susquehanna River, known as the Dock Street Dam and Lake Project and also referred to in the City's brief as the Harrisburg Hydroelectric Project (project or dam).[3] The project would be located at the southern end of

1. DER petitioned this Court for review of this interlocutory order pursuant to the footnote to Pa.R.A.P. 1311. The petition was granted by order dated August 24, 1989.

2. The purpose for certification under Section 401 of the CWA is to assure compliance with applicable state water quality standards.

3. The following petitioned to intervene in this proceeding: The Pennsylvania Environmental Defense Foundation, the Natural Resources Defense Council, Inc., the Governor Pinchot Group of the Sierra Club, the Appalachian Audubon Society, the Pennsylvania Federation of Sportsmen's Clubs, the Pennsylvania Fish Commission, and Voith Hydro, Inc. (the company which manufactures the turbines the City plans to use in the project). The Board issued an opinion and order denying all but the Pennsylvania Fish Commission, and limiting the

City Island, and would be 3,000 feet long and 17 feet high. The dam would consist of thirty-two bottom hinged flap gates and would have a power house on each side of City Island.

The City appealed the denial of certification and, subsequently, filed a Motion for Summary Judgment, alleging that DER impermissibly overstepped its authority in basing its denial on matters outside the narrow scope of the Section 401 certification process, that the necessary requirements for Section 401 certification had been met and that no issue of material fact existed. Subsequently, having acknowledged that a material fact existed regarding water quality impact downstream of the project, the City amended its request by filing a Motion for Partial Summary Judgment and To Limit Issues.

More specifically, the City asserted that DER's authority under Section 401 of the CWA allowed it to examine only whether, as a result of the project, the water downstream of the dam will violate DER's water quality regulations found at 25 Pa.Code Chapter 93 and approved by the EPA pursuant to Section 303 of the CWA, 33 U.S.C. § 1313. The City argued, therefore, that the issues should be limited to the impact of increased dissolved oxygen levels, and the water quality impact to the 150 acre area downstream of the proposed dam and upstream of the existing Dock Street Dam.[4] DER contended that Section 401 of the CWA authorized it to evaluate the effects of the project, both upstream and downstream of the dam, taking into consideration *all* of

scope of its participation to whether the project will cause discharges of pollutants, and the effect of these discharges upon fisheries and aquatic habitat.

**4.** DER's March 2, 1988 letter denying certification identified nine reasons for the denial: loss of wetlands, impact from increased groundwater levels, impact of increased dissolved oxygen levels, impact on nutrient problems in the Conodoguinet Creek, impact of combining existing sewer overflows, impact upon the 150 acre area between the proposed dam and the existing Dock Street Dam, impact upon aquatic resources upstream of the impoundment, impact upon migration of migratory fish, and impact of increased sedimentation within the pool area.

Pennsylvania's water quality related laws, policies, and regulations.

The Board elected to treat the City's motion as a motion to limit the issues and, in its Opinion and Order Sur Motion to Limit Issues, dated October 6, 1988, granted in part and denied in part the motion. The Board concluded that DER has no authority under Section 401 of the CWA to evaluate the environmental effects of "discharges of dredged or fill material" except to the extent that these discharges cause "discharges of pollutants," nor to examine "discharges of pollution." The Board, therefore, restricted the scope of evidence to be presented at the hearing to (1) whether the project will cause point source or non-point source discharges of pollutants which will violate the Commonwealth's requirements for water quality, and the effect of such discharges and (2) declared the issues of the effect of the project on wetlands, on fish migration, and on aquatic resources *to the extent that these resources are affected solely by physical changes in the river,* beyond the scope of the proceedings. DER filed a Motion for Amendment of Order to Certify Controlling Questions of Law for Interlocutory Appeal, dated April 10, 1989, which the Board denied by Order dated April 18, 1989. This appeal ensued.

The issues DER presents for our review concern the scope of a state's authority under Section 401 of the CWA, 33 U.S.C. § 1341, in issuing or denying water quality certification for activities requiring a federal license or permit, a case of first impression. DER is asking this Court to decide: (1) whether DER is authorized to consider the water quality impact of a discharge of dredged and fill material when evaluating a request for water quality certification under Section 401 of the CWA and (2) whether DER is authorized to consider pollution resulting from physical and biological changes in water quality when evaluating such a request under Section 401 of the CWA.

The Federal Energy Regulatory Commission (FERC) is vested with jurisdiction over the licensing of hydroelectric power projects, pursuant to Section 4(e) of the Federal

Power Act, 16 U.S.C. § 797(e). As part of the licensing process, a preliminary permit can be obtained from FERC, which enables an applicant to investigate the feasibility of and to develop a project for a maximum three-year period, to the exclusion of any other party. 16 U.S.C. §§ 797(f) and 798. The City obtained a preliminary permit from FERC for the project on May 25, 1984.

Before the City can obtain a license from FERC under 16 U.S.C. § 797(e), it is required by regulation at 18 CFR § 4.38(a) to engage in a pre-filing consultation process to insure that all potential impacts, including environmental impacts, are investigated and presented to FERC for evaluation during the license application period. During this process, an applicant is required to consult with a wide range of federal and state agencies, including in this instance DER, pursuant to Section 401 of the CWA. In the initial stage, a potential applicant must contact all of the appropriate agencies and provide each of them with detailed information to enable the agencies to perform their own independent investigations of the project. 18 CFR § 4.38(b)(1). The second stage of consultation requires that a potential applicant perform reasonable studies necessary for FERC to make an informed decision regarding the merits of the application. 18 CFR § 4.38(b)(2).

In compliance with 18 CFR § 4.38(a), the City provided a project feasibility report and a draft license application to the appropriate agencies, including DER. Following completion of the consultation process, the license application submitted to FERC must include, *inter alia,* the aforementioned certification by DER pursuant to Section 401 of the CWA, which certifies to FERC that the project will comply with applicable provisions of the CWA,[5] including state water quality standards approved by the United States Environmental Protection Agency (EPA). 18 C.F.R. § 4.38(c)(2)(i) and (ii). After DER received the City's draft license application, the City requested certification for the

5. 33 U.S.C. §§ 1251–1376.

project which was denied for the reasons hereinbefore enumerated in footnote 4.

DER argues that the Board's ruling that evidence concerning the discharge of dredged and fill material will be excluded at trial, but that evidence concerning the discharge of a pollutant and discharge of pollutants will be allowed is "illogical, internally inconsistent and contrary to the express terms of the CWA." DER contends that the term "discharge" contained in Section 401(a)(1) of the CWA is not only explicitly defined in the CWA as "a discharge of a pollutant," and "discharges of pollutants," but that it also implicitly refers to "discharges of pollution," and "discharges of dredged or fill material," which are caused by the dam.[6]

Discharge is defined in Section 502(16) of the CWA as follows: "The term 'discharge' when used without qualification includes a discharge of a pollutant, and a discharge of pollutants." 33 U.S.C. § 1362(16). Section 502(12) of the CWA defines the terms "discharge of a pollutant" and "discharge of pollutants" as "(A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12).

When construing a statute, the starting point is the language therein. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 *reh'g denied*, 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975).

6. Section 401(a)(1) of the CWA, 33 U.S.C. § 1341(a)(1) provides, in pertinent part:

Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any *discharge* into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the *discharge* originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the *discharge* originates or will originate, that any such *discharge* will comply with the applicable provisions of Sections 1311, 1312, 1313, 1316, and 1317 of this title. (Emphasis added.)

Absent any evidence to the contrary, a statute's plain meaning must prevail. *Id.* This Court finds no language in the CWA to support DER's contention. We agree with the Board's analysis that DER's scope under Section 401 of the CWA only allows it to evaluate whether a discharge of dredged or fill material will cause a "discharge of pollutants."

■ DER argues that dredged and fill materials are pollutants within the meaning of the CWA, citing *Minnehaha Creek Watershed District v. Hoffman,* 597 F.2d 617 (8th Cir.1979); and *Bersani v. United States Environmental Protection Agency,* 674 F.Supp. 405 (N.D.N.Y.1987), *aff'd, Bersani v. Robichaud,* 850 F.2d 36 (2d Cir.1988), *cert. denied,* 489 U.S. 1089, 109 S.Ct. 1556, 103 L.Ed.2d 859 (1989), in support thereof. We note that although the interpretation of a federal statute is involved, this Court is not bound by decisions of federal district courts. *ASARCO, Inc. v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). Only U.S. Supreme Court decisions, where relevant, are binding upon this Court. *Id.*

Additionally, *Minnehaha Creek* and *Bersani* interpret Section 404 of the CWA, 33 U.S.C. § 1344, which governs the issuance of permits by the United States Army Corps of Engineers (Corps of Engineers) for the discharge of dredged and fill material into the waters of the United States. Therefore, we conclude that they are not persuasive.

■ The dredge or fill permit is a "Federal license or permit" which is addressed in Section 401(d) of the CWA[7] and which the Corps of Engineers cannot issue until the City obtains a Section 401 certification from DER. *See* 33 C.F.R. §§ 320.3(a) and 325.2(b)(ii). It is clear under the Federal regulations governing the Section 404 dredge or fill permit process that the purpose of DER's certification under Section 401 is to evaluate any "discharge of a pollutant" which may result from the "discharge of dredged or

7. 33 U.S.C. § 1341(d).

fill material." *See* 33 C.F.R. § 320.3(a). Authority to review other environmental effects of the discharge of dredged or fill material is vested in the Secretary of the Army and the Administrator of the EPA pursuant to Section 404 of the CWA. *See also* 40 C.F.R. Part 230.

◼ We now address DER's remaining argument that it has authority to consider "pollution" resulting from physical and biological changes in water quality when evaluating a request for certification under Section 401 of the CWA. The term "pollution" is defined in the CWA as the "man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." 33 U.S.C. § 1362(19). The term "pollution" is not contained in the definition of "discharge" found at 33 U.S.C. § 1362(16), nor is the term "discharge of pollution" found anywhere in the CWA. Whenever the term "discharge" is used, it is always in conjunction with the term "pollutant." Furthermore, even though the term "pollution," as defined at 33 U.S.C. § 1362(19), may encompass the construction of a dam in connection with a hydroelectric project, we are unpersuaded that the legislature intended that such physical alterations fall under the meaning of "discharge."

DER asserts that the goals of both Federal and Pennsylvania water quality laws are the prevention and remediation of pollution and that states are specifically authorized to prevent pollution within the Section 401 certification process. DER emphasizes that the purpose of the CWA is the restoration and maintenance of the chemical, physical and biological integrity of our nation's waters.[8] This Court is mindful of Congress' intentions in promulgating the CWA and that the restoration and maintenance of the quality of our nation's waters are matters of extreme importance. We believe our decision herein is in accordance with those objectives.

◼ Upon a thorough review of the law, we agree with the Board's conclusion that authority to review the environ-

**8.** Section 101 of the CWA, 33 U.S.C. § 1251.

mental effects of the project encompassed by the term "pollution" is vested in the Corps of Engineers and in the EPA by Section 404 of the CWA. We further agree with the Board that DER exceeded its authority by examining the impact of physical changes in the river on aquatic resources and the effect of the project on wetlands and fish migration, which we hold are not within DER's authority under Section 401 of the CWA.

Accordingly, the order of the Board is affirmed.

## ORDER

AND NOW, this 26th day of June, 1990, the order of the Environmental Hearing Board in the above-captioned matter is affirmed.

DOYLE, J., dissents.