[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal from the denial of an application by the plaintiff to the Connecticut Department of Environmental Protection for a water quality certificate required for a CT Page 6800 federal license under section 401 of the federal Clean Water Act. The plaintiff, Summit Hydropower (hereafter called "Summit"), is a Connecticut partnership based in Woodstock, Connecticut. Summit has a proposed hydroelectric project on the Quinebaug River at Cargill Falls in Putnam, Connecticut. The federal license requires certification from the Connecticut Department of Environmental Protection (hereafter "DEP") as the agency which regulates discharges into navigable waters within Connecticut, that the discharge will comply with Connecticut water quality standards. The certificate from DEP is a condition precedent for a license from the Federal Energy Regulatory Commission (hereafter FERC") to construct and operate a hydroelectric facility at the proposed site.
Summit filed an application with the DEP for certification under section 401 of the Clean Water Act, also known as the Federal Water Pollution Control Act, on August 10, 1988. This application was denied by the defendant on August 10, 1989, but the letter stated that the applicant could request a public hearing. Summit requested a hearing on August 28, 1989. The Town of Putnam intervened in the proceedings to raise environmental issues pursuant to section 22a-19 of the General Statutes, and has participated as a party in this appeal. [Polymer Corporation, an owner of a portion of the water power rights at the Cargill Falls Dam, intervened in the administrative proceedings on November 21, 1990 after the record was closed. While it was served with a copy of the appeal, it has not participated as a defendant.] A proposed decision rejecting the application was issued by an administrative hearing officer, Cynthia B. Watts, on December 24, 1990. The Commissioner issued a final decision denying the water quality certificate on September 13, 1991. Summit appealed the decision on October 8, 1991, pursuant to section 4-183 of the General Statutes.
1. Exhaustion of administrative remedies; motion to dismiss.
The Commissioner has filed a motion to dismiss the appeal for lack of subject matter jurisdiction, claiming that the court has no statutory authority to review denial of an application for a certification of compliance with Connecticut water quality standards (hereafter "WQS"). The Town of Putnam claims there is no jurisdiction because Summit has failed to request a declaratory ruling on the interpretation and applicability of the Connecticut WQS as a prerequisite for claiming that the Commissioner improperly applied the standards to the application. Putnam claims that Summit's failure to obtain a declaratory ruling amounts to CT Page 6801 failure to exhaust available administrative remedies. While the claims of the Commissioner and Putnam were raised by motions to dismiss on April 16, 1992 and May 4, 1992, after the record and briefs were filed and the appeal assigned for trial, a claim of lack of subject matter jurisdiction must be disposed of no matter when it is raised before the court can proceed further with the case. Castro v. Viera, 207 Conn. 420,429; Valley Cable Vision, Inc. v. Public Utilities Commission, 175 Conn. 30, 32; Baldwin Piano Organ Co. v. Blake, 186 Conn. 295, 297.
Where the doctrine of failure to exhaust administrative remedies applies, it is now considered to go to subject matter jurisdiction. Pet v. Department of Health Services, 207 Conn. 346, 350-52; Butzgy v. Glastonbury,203 Conn. 109, 116, 122. The exhaustion rule can arise where there is an available administrative remedy by an application to the agency, in which case it must be requested, and a direct appeal or independent action in the courts is not allowed. See Conto v. Zoning Commission, 186 Conn. 106
(denial of permit in a zoning enforcement proceeding by a zoning commission required an appeal to the Zoning Board of Appeals under section 8-7 of the General Statutes rather than a direct appeal to the Superior Court under section 8-8). The customary application of the rule is that a party cannot bring an independent action to test an issue which can be raised in an administrative appeal. Carpenter v. Planning Zoning Commission, 176 Conn. 581, 598; Zizka v. Water Pollution Control Authority, 195 Conn. 682; Cavallaro v. Durham, 190 Conn. 746; Butzgy v. Glastonbury, supra, 119. In this case, Summit has appealed the Commissioner's decision after exhausting the administrative remedy of an application for the certificate to the DEP, so this is not a proper case to apply the exhaustion rule.
Even where it does apply, there are numerous exceptions, some of which apply here. First of all, a claim that an administrative agency has exceeded its statutory authority or jurisdiction may be the subject of an appeal. Payne v. Fairfield Hills Hospital, 215 Conn. 675, 679; Greater Bridgeport Transit District v. Local Union 1336,211 Conn. 436, 439. An application to the agency is also not required where the remedy would be futile or inadequate. Kosinski v. Lawlor, 177 Conn. 420, 424; Friedson v. Westport, 181 Conn. 230. A declaratory judgment application under section 4-186 would be futile since the Commissioner has already determined that aesthetics from viewing the site are a valid reason for denying a certificate for compliance with WQS, and that the regulations can be interpreted in that manner. Summit's claim that aesthetics is not a valid reason CT Page 6802 for denying the certificate was squarely raised and decided already by the Commissioner, and is a major issue in this appeal. There is no reason to believe that the Commissioner would reach a different result if the issue were raised again by an application under section 4-176. Finally, an application to an administrative agency is not required where the interpretation of statutes is requested. Aaron v. Conservation Commission, 178 Conn. 173, 179; Powers v. Ulichny, 185 Conn. 145, 147.
2. Requirement for a contested case; motion to dismiss.
The Commissioner claims that Summit has no standing to maintain this appeal because it has not appealed in a contested case proceeding and has filed a motion to dismiss on this ground. It is well established that appeals from decisions of administrative agencies exist only to the extent and subject to the statutory limitations creating the right to appeal. Tarnopol v. Connecticut Siting Council,212 Conn. 157, 163; Basilicato v. Department of Public Utility Control, 197 Conn. 320, 322. As a result, only a party who has exhausted all administrative remedies available within the administrative agency and who is aggrieved by a decision in a contested case is entitled to bring an appeal under section 4-183 of the General Statutes. Park City Hospital v. Commission on Hospitals Health Care, 210 Conn. 697,702. It is undisputed by the parties that the Connecticut DEP is required to issue a certificate of compliance as to Connecticut WQS for purposes of compliance with the Federal Water Pollution Control Act (hereafter "FWPCA"),33 U.S.C. § 1341(a) (also known as section 401 of the Clean Water Act). The Commissioner claims, however, that there is no statutory requirement that the DEP have a hearing on its certification review, so that any decision which is made is not a final decision in a contested case as defined in section 4-166 of the General Statutes, which in turn is a prerequisite for judicial review under section 4-183 of the General Statutes. Section 4-183(a) no longer limits appeals to a contested case, and only requires the appellant to be aggrieved by a final decision of the agency. However, the Commissioner contends, and Summit apparently does not contest, that the version of the statute in effect prior to July 1, 1989 controls because the underlying agency proceedings here for certification commenced prior to that date. See Vernon Village, Inc. v. Carothers, 217 Conn. 130,138. The prior version of section 4-183(a) provides as follows: A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial CT Page 6803 review by way of appeal under this chapter.
The relevant portion of section 4-166(2) defines a "contested case" as "a proceeding . . . in which the legal rights, duties or privileges of a party are required by statute to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held. . . ." A "final decision" includes the "agency determination in a contested case," but "the term does not include a preliminary or intermediate ruling or order of an agency . . . ." Section 4-166(3) of the General Statutes. The test for determining whether a proceeding is a contested case requires the court to consider whether three factors are met: (1) whether a legal right, duty or privilege is at issue; (2) whether the legal right, duty or privilege is statutorily required to be determined by the agency; and (3) whether the statutorily required determination was in fact made at a hearing or was required by law to be made at a hearing; Herman v. Division of Special Revenue, 193 Conn. 379, 382; see also Taylor v. Robinson, 171 Conn. 691, 696, 697. Since certification is required from the Commissioner under33 U.S.C. § 1341(a) as a prerequisite for operating a hydroelectric facility, the requirement for a permit makes the matter before the agency a proceeding to determine a legal right, duty or privilege. A "license" is defined a section 4-166(6) to include "the whole or part of any agency permit, certificate, approval, registration, charter or similar form of permission required by law. . . ."
In the case of a discharge into navigable waters, any applicant for a federal license must obtain a certification from the state agency that the discharge will comply with the FWPCA and each state "shall establish procedures for public notice in the case of all applications for certifications by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications."33 U.S.C. § 1341(a)(1). As a result, Summit had its right to a certificate to be statutorily determined by the Connecticut DEP. Moreover, section 22a-424(g) of the General Statutes requires the Commissioner to hold such hearings as may be required under the Connecticut Water Pollution Control statutes (Chapter 446K) and the FWPCA or other applicable federal law, and section 22a-424(k) gives the Commissioner the power and duty "[t]o exercise all incidental powers necessary to carry out the purposes of this chapter and the Federal Water Pollution Control Act." It was recently recognized in New England Dairies, Inc. v. Commissioner of Agriculture, 221 Conn. 422, 427, that in order to have a contested case, the issue must be required by statute to be determined by the agency and that this is a distinct CT Page 6804 requirement from the third part of the test, namely, an opportunity for a hearing, or a case where a hearing is actually held, citing Herman v. Division of Special Revenue, supra, 383 n. 5.[1]
The situation here is different because Summit had a statutory right to have its application decided by the Commissioner whether or not the Commissioner decided to hold public hearing. This case is also different from Taylor v. Robinson, supra, (no apparent statutory requirement for a parole release hearing) and Herman v. Division of Special Revenue, supra, (reinstatement requests by a patron of a Jai Alai facility) where a hearing was held by the state agency even though the agency had no statutory requirement to decide the issue or hold the hearing. Since the Commissioner was required to determine for the state under the federal statute whether a certificate should be issued, the cases relied upon by the Commissioner do not apply. See Duffy v. State Employee's Retirement Commission, 6 Conn. L. Rptr. 67 (1992) Maloney, J.).
The fact that neither state nor federal law requires a hearing on an application for a WQS certificate is irrelevant to the second requirement for a contested case.
The third requirement, however, is that a statute either require an opportunity for a hearing or in which a hearing is in fact held. Herman v. Division of Special Revenue, supra, 382, 383 n. 5; New England Dairies, Inc. v. Commissioner of Agriculture, supra, 427. The statute does not require both. Whether or not a public hearing was required, the Commissioner held one as requested by the applicant. The hearing was extensive and the Town of Putnam intervened and offered evidence in opposition to the application. The hearing was a comprehensive and contested proceeding. The proceedings before the Commissioner met the characteristics of an administrative hearing. See Rybinski v. State Employees' Retirement Commission, 173 Conn. 462,469, 470. The South Carolina case relied upon by the Commissioner is distinguishable even though it also involved section 401 certification because the facts of that case and the definition of "contested case" under South Carolina law is not identical to the requirements in section 4-166(2) of the Connecticut General Statutes. See Triska v. Department of Health and Environmental Control, 292 S.C. 190,355 S.E.2d 531 (1987).
Since the proceeding here was a "contested case" under Connecticut law, the denial of the application after the hearing was a "final decision" under section 4-166(3) because CT Page 6805 an agency determination was made in a contested case. Accordingly, Summit had the right to appeal under section 4-183(a) under the version of the statute in effect prior to July 1, 1989. This court has jurisdiction over the appeal, and the motion to dismiss is denied.
3. Aggrievement
In order to take an appeal under section 4-183(a), the appellant must prove aggrievement. Aggrievement is a question of fact. Winchester Woods Associates v. Planning Zoning Commission, 219 Conn. 303, 308. Summit has applied to the FERC and the Connecticut DEP for the section 401 certificate, and the federal application to the FERC for a hydroelectric license is pending and conditional upon the certificate involved in this appeal. Summit intends to build and operate the hydroelectric facility if approvals are obtained, and will obtain revenues from the sale of electricity generated by the facility. The test for aggrievement is a two-part determination: (1) the appellant must show a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole; and (2) the appellant must show that the specific personal and legal interest has been specially and injuriously affected by the decision. Rigging Co. v. Department of Public Utility Control,219 Conn. 168, 173; Bakelaar v. West Haven, 193 Conn. 59, 65. Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest has been adversely affected. State Medical Society v. Board of Examiners in Podiatry, 203 Conn. 295, 300; Hall v. Planning Commission, 181 Conn. 442, 445; Light Rigging Co. v. Department of Public Utility Control, supra, 173. The 401 certificate required by Summit is a prerequisite for the FERC license and would be issued to Summit, which would then have the right to condemn any property interest necessary to develop the project. 16 U.S.C. § 814. Summit has a unique interest in the requested certificate. The failure of the DEP to issue the certificate will block the project entirely and have an adverse financial effect on Summit. The plaintiff has proven compliance with the two-part test for aggrievement under section 4-183 and has standing to maintain this appeal. Id., 172.
4. Scope of judicial review; findings of the Commissioner.
When an appeal is taken under section 4-183, the scope of judicial review is restricted. New Haven v. Freedom of CT Page 6806 Information Commission, 205 Conn. 767, 773; C H Enterprises, Inc. v. Commissioner of Motor Vehicles,176 Conn. 11, 12. The court cannot retry the case or substitute its own judgment for that of the agency. Id., 12; New Haven v. Freedom of Information Commission, supra, 773. The question is not whether the trial court would have reached the same conclusion, but whether the record before the agency supports the action taken Williams v. Liquor Control Commission, 175 Conn. 409, 414. The court's ultimate duty is only to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. Buckley v. Muzio, 200 Conn. 1, 3; New Haven v. Freedom of Information Commission, supra, 773; Persico v. Maher, 191 Conn. 384, 409. The trial court is bound by reasonable conclusions of fact made by an administrative agency. Campisi v. Liquor Control Commission, 175 Conn. 295, 296.
Unlike most appeals under section 4-183, Summit does not question whether the findings of the Commissioner are based upon substantial evidence, but rather questions whether the decision was valid as a matter of law and whether legally sufficient reasons were assigned for denial of the certificate. Section 4-183(g) of the General Statutes [now section 4-183(j)] allows the court to reverse and modify the agency's decision:
 "[S]ubstantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
Factual determinations of the agency are governed by the substantial evidence rule in subsection (5) which allows very limited judicial review. See Persico v. Maher, supra, 409; Huck v. Inland Wetland Watercourses Agency,203 Conn. 525, 541. Although the factual and discretionary decisions of administrative agencies are to be given considerable weight by the courts, the court and not the administrative agency decides and applies governing CT Page 6807 principles of law and determines questions of law based upon the interpretation of statutes. Connecticut Hospital Assn. v. Commission on Hospitals Health Care, 200 Conn. 133,140. Summit claims in general terms that even if the factual findings and conclusions of the DEP are accepted, that it exceeded the federal and state statutory authority for reviewing a water quality standards certificate and that the Connecticut WQS do not allow denial of a project for reasons which do not affect water quality, such as the aesthetics of viewing the water and surrounding landscape. Summit's claims can be upheld only if they fit under section 2, 4 or 6 of section 4-183(g). The court does not have to defer to an incorrect decision of law by the agency. Id., 140; Board of Education of Ridgefield v. Freedom of Information Commission, 217 Conn. 153, 159.
The material facts in this appeal are not disputed, and consist of the factual findings of the Commissioner made in the proposed decision of the hearing officer dated December 24, 1990 as modified by the Commissioner's final decision of September 12, 1991. The modified application of September 7, 1988 was initially denied by the Commissioner on August 10, 1989 on the ground that the proposed project was inconsistent with the antidegradation provisions of the WQS. The Commissioner concluded initially that the project could reasonably be expected to adversely affect the quality of the Quinebaug River including: (1) the physical, chemical and biological integrity and uninterrupted instantaneous flow of the river; (2) the designated uses for the river, including recreational use and enjoyment, fish, other aquatic life and wildlife and their habitat, and other legitimate uses of the river; and (3) the aesthetic quality of the river. (See DEP Exhibit 11.) Summit appealed to the initial denial and requested a hearing on the application which was then held on December 11, 1989 and January 26, 1990.
While the record is extensive and includes numerous exhibits analyzing the effect of the project upon the Quinebaug River, most of it is unnecessary to the outcome of the appeal. The Town of Putnam, which intervened under section 22a-19 of the General Statutes, produced numerous photographs going back many years showing the Cargill Falls area. It argued that the aesthetics of the site would be affected by construction of the project since there would be some reduction in the water flow rates at some times during the year which would be noticeable to persons viewing the area. While the Commissioner ultimately denied the application for aesthetic reasons, both the hearing officer and the Commissioner did not find any adverse affect upon the river or the water quality based upon the WQS from the fact CT Page 6808 that the hydroelectric project would affect the method of flow of waters in the river. The following findings of fact are relevant to the legal issues in this appeal.
The site has been used for the production of hydropower since 1730. The proposed hydroelectric project would use an existing dam owned by the Town but would require the construction of a new power house and a tailrace resulting in a bypass reach of about 100 feet in length below Cargill Falls and a 1.2 megawatt turbine generator in the power house to divert the water. The project would be operated in a run of the river mode, which means that neither the impoundment level nor the river flow rate downstream of the project would be affected because the water used in the turbine would be released back into the water. In other words, the rate of water entering the project would equal the rate of water leaving it on an instantaneous basis. (Finding 1.) The applicant initially proposed minimum stream flow (MSF) releases of 15 cubic feet per second (CFS) over the spillway, but in response to concerns of the DEP staff, this was changed to a constant MSF of 58 CFS to be released over the spillway of the dam when the turbine is in operation. The average annual flow at the site is approximately 447 CFS and flows exceed 58 CFS approximately 95 percent of the time, although flows vary considerably from day to day. (Finding 9.) Discussions between Summit and the DEP staff resulted in an agreement for a variable minimum flow requirement between 80 CFS and 145 CFS. The applicant submitted an aesthetic impact study and numerous photographs of the falls at various flow rates in order to substantiate its claim that the falls and river would maintain its present aesthetic quality if the project was approved at the proposed flow rates. There was testimony from the director of the Inland Water Resource Management Division of the Bureau of Water Management that the water quality parameters on silt or sand deposits, turbidity, coliform bacteria, dissolved oxygen, pH, taste, and odor would not be adversely impacted by the project. The director, Thomas Morrissey, also testified that the stipulation was consistent with the WQS of the DEP for Class B waters, did not violate the state's antidegradation policy and that the DEP's MSF requirements would be met by an MSF release of 58 CFS. (Findings 20, 22.) The DEP's earlier fish and wildlife concerns were met, and it conceded that the natural resources of the state would be protected and the aesthetic quality and recreational use of Cargill Falls would be maintained by the proposed project. (Finding 24.) Morrissey testified that the DEP staff did not believe that adoption of the stipulation would alter the essential character of the falls. (Finding 25.) CT Page 6809
The Quinebaug River at the site of the proposed project is classified as a Class C surface water body with a goal of Class B, and the Class B water quality criteria were used to evaluate the project. (Finding 19.) The designated uses for Class B waters are: recreational use, fish and wildlife habitat, agricultural and industrial supply and other legitimate uses including navigation. (Finding 19.) The criteria for Class B inland surface waters are contained in the WQS of the DEP dated February, 1987, pages 12-14 (DEP Exhibit 13.) The standard for "aesthetics" for a Class B surface water body is "good to excellent." (Finding 19; DEP Exhibit 13, page 12.) The term "aesthetics" is not defined in the WQS. (Finding 26.) A review of the WQS, however, shows that the standards are directly related to the quality or classification of the inland surface waters. By comparison, the standard for aesthetics for a Class A stream are "uniformly excellent," while for a Class C stream, it "may be poor to excellent," and there is no standard for Class D waters. (DEP Exhibit 13, pages 10, 15, 17.) There are similar standards for the comparable grades of coastal and marine surface waters. The hearing officer and the Commissioner concluded that the proposed project would meet the fisheries regulations MSF requirements. (Conclusion B.)
The findings and conclusions of the Commissioner in effect eliminated the first two reasons for denial of the initial application on August 10, 1989, leaving only the third reason, namely, the aesthetic quality of the river. The Commissioner does not claim that the project will in any way affect the aesthetics of the water itself, namely, how the water looks. The parties dispute whether viewing the falls can be considered a regulated recreational use of the river under the WQS.
The Commissioner claims that in considering recreational purposes and uses, the DEP is not limited to those activities that are by definition in-stream uses, and that viewing the falls is within the scope of the WQS because it is a quiet form of recreation. (Conclusion C.) It is undisputed that the project does not propose diversion of water from the river, and there will be no reduction in the total volume of water in the Quinebaug River at any time from the project. The Commissioner concluded, however, that the viewing of Cargill Falls is a recreational use and that the project would have a detrimental effect on the aesthetic quality of viewing the falls by reducing the water level of the natural river flow. (Conclusion F, as modified.)
Summit claims that the Commissioner's conclusions are not a valid reason for denying a water quality certificate. CT Page 6810 It claims that the visual impact of the site (as opposed to viewing the quality of the water) is not a proper consideration under the Connecticut WQS, and that it is not a proper consideration in any event when acting on a water quality certification request under 33 U.S.C. § 1341.
5. Authority of the Commissioner to deny an application for aesthetic reasons.
Before considering limitations imposed by federal law on review of the project by the DEP, the initial question is whether the Commissioner exceeded his authority under state statutes and the DEP regulations by denying the application for the assigned reason.
The parties disagree on the extent to which state regulations in the form of the WQS and the Commissioner's interpretation of them controls as to the findings required to issue a water quality certificate under the federal statutes. The purpose of the federal statutes on water quality is to restore and maintain the quality and integrity of the waters of the United States. See33 U.S.C. § 1251. The purpose of the Clean Water Act is "to establish an all encompassing program of water pollution regulation." Milwaukee v. Illinois, 451 U.S. 304, 318 (1981). Each state is required under section 303 of the Clean Water Act (CWA) to adopt water quality standards identifying permitted uses of the waters within the state and the water quality criteria for such uses. 33 U.S.C. § 1313(c)(2)(A). The CWA and other federal statutes do not preclude any state from regulating discharges of pollutants and regulating control or abatement of pollution, and do not prevent the states from regulating waters within their boundaries.33 U.S.C. § 1370. States may have water quality standards and regulations which are more stringent than those provided by federal law. Id. As the agency which regulates navigable waters within this state, the Connecticut DEP has regulatory authority over the Quinebaug River to the extent authorized by state statute and administrative regulations implementing those statutes. The Commissioner is correct that the Connecticut WQS may impose state requirements that go beyond what is federally mandated without being inconsistent with the FWPCA. As discussed below, however, this does not necessarily mean that when reviewing an application for water quality certification that all of the Connecticut WQS, as interpreted by the Commissioner, can be used to block an otherwise acceptable application under federal law.
In order to operate the proposed hydroelectric project, Summit must obtain approval from the FERC. Under CT Page 681133 U.S.C. § 1341(a)(1), "any applicant for a federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the state in which the discharge originates that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316 and 1317 of this title . . . ." The term "discharge" when used without qualification in the FWPCA includes a discharge of a pollutant or pollutants. 33 U.S.C. § 1362 (16). The terms "pollutant" and "discharge of a pollutant" are also defined for purposes of the FWPCA in 33 U.S.C. § 1362(6) and (12). Summit does not propose to make a discharge into the Quinebaug River of any pollutant as those terms are defined in the federal statutes, nor does the Commissioner claim that the proposed project will affect the water quality of the Quinebaug River in any way. The state agency reviewing a certification application under 33 U.S.C. § 1341
can determine whether any pollutants discharged by a project meet state water quality standards, but the state agency is limited by the federal definitions to standards governing discharge of pollutants. Commonwealth of Pennsylvania, Department of Environmental Resources v. City of Harrisburg, 578 A.2d 563, 567 (Pa. Comwlth., 1990).
In Arnold irrigation District v. Department of Environmental Quality, 79 Or. App. 136, 717 P.2d 12741, 1278, 1279 (1986), it was held that a state environmental agency could not deny a certification under 33 U.S.C. § 1341, based upon standards unrelated to the FWPCA, and any conditions placed on certification under subsection (d) had to be related to water quality. Arnold Irrigation recognizes that while state standards can be stricter than federal requirements, there are limitations on applying them to federally mandated certifications.
In this case, the Commissioner had no problem with the quality of the water which would be diverted through the turbine generator and returned to the river, but denied the application for a reason which had nothing to do with pollution or a "discharge" as defined in the FWPCA. While the Commissioner could apply any requirements for discharges in the Connecticut WQS which were stricter than federal standards to the project, after extensive review he concluded that the Connecticut standards on that subject were met.
Where the state agency grants certification, it can indicate effluent limitations and other limitations and monitoring requirements necessary to comply with federal CT Page 6812 standards and any other appropriate requirement of state law.33 U.S.C. § 1341(d). The reason for denial here does not amount to an appropriate requirement of state law. Moreover, the statute allows conditions on approval of certification and does not apply to an outright denial of a certification request.
The Commissioner rejected the application for a reason not authorized under federal law even though the FWPCA allows the state to have stricter standards on water quality. For this reason alone, the denial was improper. Denial of the application, based on the aesthetics of viewing the falls, is not a WQS. While there is no precedent in this state, the scope of authority of a state environmental agency in certifying hydroelectric projects under 33 U.S.C. § 1341(a) has been determined by the highest court in our neighbor, the Empire State, which reconciled the application of both the Federal Power Act and the FWPCA with review by that state's environmental protection agency. The FWPCA relinquishes only one element of the otherwise exclusive production under the Federal Power Act, by allowing the state agency to determine only the narrow question whether there is reasonable assurance that the construction and operation of the proposed project will not violate applicable state WQS. The state agency cannot engage in a broader environmental impact review of the project or reject it for any reasons except noncompliance with existing WQS. Power Authority of State of New York v. Williams, 60 N.Y.2d 315, 326, 327,469 N.Y.S.2d 620, 624, 625, 457 N.E.2d 726 (1984); Matter of deRham v. Diamond, 32 N.Y.2d 34, 44-45; 343 N.Y.S.2d 84,295 N.E.2d 763 (1973). The Commissioner has conceded this limited authority to review the plaintiff's application (DEP brief p. 18) but contends that the aesthetics of viewing the water is a WQS, and that no special environmental review was made of the project. The problem with the defendants' argument is that the aesthetics of viewing the water is not a standard in the DEP's existing regulations, not authorized by the enabling statutes as a proper WQS and, in any event, cannot objectively be considered a factor in evaluating water quality. While the federal statutes defer to a limited extent to state WQS in approving a hydroelectric project, at some point the federal preemption doctrine prevents state rejection for reasons having at best a marginal relationship to water quality. It is unnecessary to go that far here because the Commissioner's decision exceeds his authority under both state law and the FWCPA.
To the extent the federal statutes defer to stricter standards in state water quality regulations and recreational use of water in particular, it is apparent from several CT Page 6813 federal statutes and regulations that the recreational activities to be protected are those "in and on the water" and not some vague, aesthetic impression from viewing the waters at a distance. See 33 U.S.C. § 1251(a)(2),1312(a), 1314(a)(5)(b); 40 C.F.R. § 131.2, 131.11(b),131.12(a). While not controlling, this provides some guidance on what constitutes recreational activities for purposes of water quality standards which may be applied to certifications for federal licenses.
The powers and duties of the Commissioner in the area of water quality are contained in Chapter 446K of the General Statutes, entitled Water Pollution Control. While the powers and duties of the Commissioner in this area are broad, a reading of section 22a-424 of the General Statutes indicates that the purpose of the statutes is to adopt programs and licensing for the prevention, control and abatement of pollution of the waters of the state. Specifically, the Commissioner is directed to adopt regulations to implement Chapter 446K and to comply with the FWPCA and the Federal Safe Drinking Water Act, and to exercise all incidental powers necessary to carry out Chapter 446K and the FWPCA. Section 22a-424(k)(1) of the General Statutes. Standards of water quality are governed by section 22a-426 which provides in part that the standards shall be consistent with the FWPCA. Standards of quality authorized by the statute shall, among other things, (3) protect the public health and welfare and promote the economic development of the state; and (4) preserve and enhance the quality of state waters for present and prospective future use for public water supplies, propagation of fish and aquatic life and wildlife, recreational purposes and agricultural, industrial and other legitimate uses. Section 22a-426(a) of the General Statutes. Neither the Commissioner nor the intervenor have identified any provision in Chapter 446K that allows the Commissioner to deny permits and applications on the ground of aesthetics, or to consider the visual impact of viewing waters to be the subject of water quality regulations. Moreover, as the hearing officer noted, the term "aesthetics" is not defined in the WQS.
The question whether a statute or regulation applies to a set of facts is a question of law for the court. Plastic Distributors, Inc. v. Burns, 5 Conn. App. 219, 225. the Commissioner concluded that viewing the falls is a recreational use and that this aesthetic consideration allows denial of an application which otherwise meets the WQS, the court is not bound by that conclusion. When interpreting a statute, the court is not limited by the rule that it should not substitute its judgment for that of the administrative CT Page 6814 agency on factual issues and discretionary determinations, and the interpretation of the statute is a question of law for the court. Connecticut Hospital Assn. v. Commission on Hospitals and Health Care, supra, 140. The court can decide whether there was an error in the construction of the administrative agency's authorizing statutes. Fellin v. Administrator, 196 Conn. 440, 446. The court can reverse the decision of an administrative agency under section 4-183(j)(4) for an error of law. Board of Education v. Freedom of Information Commission, supra, 159. Viewing the water from a distance cannot reasonably be considered what is intended as preserving and enhancing the quality of state waters for recreational purposes within the meaning of section 22a-426(a)(4) of the General Statutes.
An administrative agency can only adopt regulations within its delegated authority. Waterbury v. Commission on Human Rights Opportunities, 160 Conn. 226, 230. The enabling statutes do not give the DEP authority for water quality regulations based on section 22a-426 to consider aesthetics in viewing the water. Even if the statutes could be stretched to allow aesthetic considerations to be placed in the regulations and WQS, the regulations themselves must have standards to avoid decisions which allow the agency to interpret and apply its regulations in more than one manner according to the whim of the agency on an application by application basis. Ghent v. Planning Commission, 219 Conn. 511,517; Sonn v. Planning Commission, 172 Conn. 156, 162. The WQS contain no definition of aesthetics or any standard for evaluating it. Recreational use is also not defined in the regulations. Imposing upon the applicant the burden of proof by a preponderance of the evidence that its proposed use be aesthetically pleasing to the Commissioner is an arbitrary, illegal standard. See Helbig v. Zoning Commission, 185 Conn. 294, 314 (a standard of sufficient proof as the Commission may require is a standard without any reasonable parameters). Vague and undefined aesthetic considerations alone are insufficient to support regulation under the police power. DeMaria v. Planning Zoning Commission, 159 Conn. 534, 541. As stated in Beach v. Planning Zoning Commission, 141 Conn. 79, 85:
 "[E]ven if the statute had given the commissioner power to legislate in this regard, it would not follow that the commission could, in one isolated case and without any standards to guide it, disapprove a subdivision for a reason which it would not be required to apply to all subdivisions as to which the same reason CT Page 6815 obtained . . . It would amount to substitution of the pure discretion of the commission for a discretion controlled by fixed standards applying to all cases of a like nature. It would deprive the applicant of his property without due process of law."
What is aesthetically pleasing to view and its significance to the viewer is a matter of personal opinion, and allowing decisions to be made on that basis amounts to no standard at all and an open invitation to inconsistent results, arbitrary action and preferential treatment. Regulations giving virtually unlimited discretion to an administrative agency on whether or not to grant permission or a license for an activity or to use property are illegal. DuPont v. Liquor Control Commission, 136 Conn. 286, 289; State v. Kievman, 116 Conn. 458, 470.
The Commissioner contends that other statutes allow consideration of aesthetic factors when regulating waters and wetlands. While aesthetics are referred to in the statement of policy for the title wetlands statutes, and "adverse impacts on coastal resources" are defined under section 22a-93(15) of the Coastal Management Act as including "degrading visual quality through significant alteration of the natural features of vistas and view points," these provisions apply to coastal waters where there is a materially different scheme of statutory regulation. More important, the fact that the legislature did not include aesthetics in sections 22a-424 and 22a-426 and the other water pollution control statutes in Chapter 446 undercuts the Commissioner's argument that aesthetics are a proper consideration for water quality standards. As it did with the coastal water statutes, the legislature could have included aesthetic considerations in Chapter 446K if this was considered important. See Lametta v. Connecticut Light Power Co., 139 Conn. 218, 220.
The Commissioner also argues that the court should defer to the DEP's interpretation of the enabling statute and applicable regulations. Griffin Hospital v. Commission on Hospitals Health Care, 200 Conn. 489, 496, 497. However, this concept does not apply to construction of a statute on an issue that has not previously been subjected to judicial review. Lieberman v. Board of Labor Relations, 216 Conn. 253,263; Texaco Refining Marketing Co. v. Commissioner,202 Conn. 583, 599. The concept also does not apply where the agency itself has not previously ruled on the issue. State Medical Society v. Board of Examiners in Podiatry,208 Conn. 709, 719. While the Commissioner may have CT Page 6816 considered aesthetics in construing other regulations, there is nothing in the record to suggest that the WQS or water pollution control regulations have ever been construed to deny an otherwise acceptable permit for a water quality certificate because of the aesthetics of viewing a site. In addition, any aesthetic impressions of the Commissioner or employees of the DEP from viewing the site of the project is hardly a matter of any special expertise or environmental talents.
For these reasons, the Commissioner exceeded his legal authority in reviewing a request for water quality certification under section 401 of the CWA by denying it based on the aesthetics of viewing the site. The decision is reversed under section 4-183(g) subsections (2), (4) and (6) of the General Statutes.
6. Federal preemption claim.
Summit also claims that the FERC has exclusive jurisdiction over the general environmental impact of a hydroelectric project. The states cannot exercise a veto power over such projects by requiring them to obtain state permits which cover the same substantive areas as the federal statutes. First Iowa Hydro-electric Cooperative v. Federal Power Commission, 328 U.S. 152, 166-171 (1946). In California v. Federal Energy Regulatory Commission,495 U.S. 490, 506, 100 S.Ct. 2024, 109 L.Ed.2d 474, 491
(1990), where the FERC set a minimum flow rate for a hydroelectric project after considering the project's economic feasibility and environmental consequences, it was held that greater requirements under state law could not be imposed, and the Federal Power Act and conditions established under it preempted state law. Congressional intent was not to allow state environmental agencies to impose requirements amounting to a veto of a project that was approved and licensed by FERC.
The Commissioner concedes that an overall environmental impact review of Summit's project under state law is preempted by the Federal Power Act and that it cannot be done as part of a review of a certificate under33 U.S.C. § 1341. However, both the Commissioner and Putnam argue that this case does not involve an attempt by the state to regulate a hydroelectric project but only a request for certification of compliance with state WQS as required by federal law. Summit argues that since the FERC must consider the overall impact of a hydroelectric project, including its impact on the natural beauty of the site, Scenic Hudson Conservation conference v. Federal Power Commission, CT Page 6817354 F.2d 608, 613, 624 (2nd Cir. 1965), that federal law preempts similar state DEP review. It is unnecessary to resolve this issue since the Commissioner exceeded his authority under state law and the federal statute, 33 U.S.C. § 1341, by denying certification based on the aesthetics of viewing the site.
7. Conclusion
Since there is no valid reason for denying certification, and Summit is entitled to it, the Commissioner can be directed to issue the certificate. See Plastic Distributors, Inc. v. Burns, supra, 230; DeMaria v. Planning Zoning Commission, supra, 540; Executive Television Corporation v. Zoning Board of Appeals, 138 Conn. 452,457, 458; Potter v. Board of Selectmen, 166 Conn. 376,380.
The motions to dismiss are denied. The appeal is sustained and the Commissioner is directed to issue the certificate.
Robert A. Fuller