Argued and submitted March 10, reversed and remanded for reconsideration on petition, affirmed on cross-petition April 23, reconsideration denied June 6, petition for review denied September 16, 1986 (301 Or 765)

In re Lava Diversion Project
FERC No. 5205
Deschutes County, Oregon.
ARNOLD IRRIGATION DISTRICT et al,
*Petitioners - Cross-respondents,*

*v.*

DEPARTMENT OF ENVIRONMENTAL QUALITY,
*Respondent - Cross-respondent,*
NORTHWEST ENVIRONMENTAL DEFENSE CENTER,
*Respondent - Cross-petitioner.*

(25-WQ-CR-FERC-P5205; CA A35731)

717 P2d 1274

Neil R. Bryant, Bend, argued the cause for petitioners - cross-respondents. With him on the brief were Benjamin Lombard, Jr., and Gray, Fancher, Holmes & Hurley, Bend.

Michael Huston, Assistant Attorney General, Portland, argued the cause for respondent - cross-respondent. With him on the brief were Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, and Michael D. Reynolds and Mary J. Deits, Assistant Attorneys General, Salem.

Steven R. Schell, Portland, argued the cause for respondent - cross-petitioner. With him on the brief was Rappleyea, Beck, Helterline, Spencer & Roskie, Portland.

Before Warden, Presiding Judge, and Van Hoomissen and Young, Judges.

YOUNG, J.

## YOUNG, J.

This case concerns the criteria which the Department of Environmental Quality (DEQ) may use in determining whether to issue a certificate of compliance with the Federal Water Pollution Control Act (also known as the Clean Water Act (CWA))[1] and what conditions it may place on the certificate. Petitioners seek review of a final order of the Environmental Quality Commission (EQC) affirming a DEQ decision denying them a certificate of compliance for a hydroelectric project on the Deschutes River. DEQ denied the certificate, because petitioners did not provide a statement from Deschutes County that the project was compatibile with the county's comprehensive plan and land use ordinances. Petitioners assert that federal law limits DEQ's consideration to water quality concerns and that the land use provisions are not related to water quality. Respondent Northwest Environmental Defense Center cross-petitions and seeks to require DEQ to deny the certificate on the additional ground that, under DEQ's regulations, hydroelectric power is not a beneficial use on the affected portion of the river. We reverse and remand for further proceedings on the petition and affirm on the cross-petition.

Petitioners are jointly involved in a proposal to divert water from the Deschutes River south of Bend for hydroelectric generation. The project will return the water to the river some distance downstream after using the natural fall of the river to produce power. Petitioner General Electric Development, Inc., holds a planning and design permit from the Federal Energy Regulatory Commission (FERC) for the project, and petitioners have applied to FERC for a license to build and operate it. Because the project involves a discharge into navigable waters, section 401 of the CWA, 33 USC § 1341,[2] requires petitioners to provide a certificate that the project complies with the act before FERC may issue the license. Under CWA, the certifying body is usually not a federal

---

[1] The Water Pollution and Control Act was originally adopted in 1948. Pub. L. 80-845, 62 Stat 1155. It was extensively amended in 1972. Pub. L. 92-500, 86 Stat 816. References in this opinion to the Clean Water Act are to the act after the 1972 amendments.

[2] For ease of reference, our first citations to a CWA section include both the section number of the act and the United States Code section where it is compiled. Thereafter, we generally cite only to the code.

agency; rather, it is usually a state agency responsible for administering the act. The compliance certified is not with standards which the federal government has established but with standards adopted by the state and only approved by the federal Environmental Protection Agency (EPA).[3] This hybrid arrangement, with state agencies acting under federal law, is the source of much of the confusion in this case.

Congress' purpose in adopting the CWA was "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 USC § 1251(a). It did not, however, seek to achieve its purpose by exercising federal control and administration over those waters. Rather, "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator [of the EPA] in the exercise of his authority under this [Act]." 33 USC § 1251(b).

■ In accordance with the emphasis on state responsibility and administration, the CWA places primary responsibility for the development of water quality standards on the states, subject to EPA approval. *See, e.g.,* CWA § 303(a), 33 USC § 1313(a). Only if the state fails to act, or if its standards are less strict than those the act requires, will the federal government intervene directly. *See, e.g.,* 33 USC § 1313(b); *Mississippi Comm. on Natural Resources v. Costle,* 625 F2d 1269 (5th Cir 1980). Federal requirements for the content of the regulations are only minimums; state standards may be stricter. CWA § 510, 33 USC § 1370; 40 CFR § 131.4; *Homestake Min. Co. v. U.S. Environ. Protect.,* 477 F Supp 1279, 1283 (D SD 1979).

States establish standards under 33 USC § 1313 by first designating the uses of the waters which they wish to assure; they then adopt water quality standards which will allow the designated uses to be actual uses. "Such standards shall be such as to protect the public health or welfare,

---

[3] EQC is the Oregon agency with ultimate authority for adopting the standards and issuing the certificates. ORS 468.730. However, it functions primarily as an appellate body, and DEQ does most of the actual work and promulgates the standards.

enhance the quality of water and serve the purposes of this [Act]. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation." 33 USC § 1313(c)(2). The state standards applicable to the "Deschutes Basin" are found in OAR 340-41-562 through OAR 340-41-580; EPA has approved them. Hydroelectric generation is not one of the designated uses which those standards are designed to foster on the stretch of the river in question. OAR 340-41-562, table 9.

■■ The certificate which petitioners have to have from the state before they can proceed with the project is that the discharge will comply with the applicable provisions of sections 301, 302, 303, 306 and 307 of CWA, 33 USC §§ 1311, 1312, 1313, 1316 and 1317. 33 USC § 1341(a)(1). Neither DEQ nor EQC found that the proposal violated any of those sections or any of the regulations adopted by the state under CWA authority. Violation of one of those sections or regulations is the only basis on which the state has authority under the CWA to deny the certificate. The power to issue the certificate is solely a creature of federal law; the state agencies are controlled by that law in their decisions on applications. They may not consider other factors than compliance with the provisions listed in 33 USC § 1341(a)(1) and with the state regulations in deciding whether to issue a certificate. EQC therefore erred when it affirmed DEQ's denial on the basis of a failure to show compliance with state and county land use requirements. We must, therefore, remand the case for reconsideration under the correct legal standard. ORS 183.482(8)(a)(B).[4]

---

[4] Despite the parties' extensive arguments, this case does *not* involve federal preemption of state regulation. The CWA is a federal act in which Congress has provided for significant state involvement. 33 USC § 1341 gives the states a veto over federal actions. What criteria the states may consider in exercising that veto is a matter of federal, not state, law. The states, in passing on applications for certificates, act in part as agents of the federal government, and they may act only where Congress has permitted. This case is therefore unlike *First Iowa Hydro-Elec. Coop v. Federal Power Com'n*, 328 US 152, 66 S Ct 906, 90 L Ed 1143 (1946), in which the Supreme Court held that the Federal Power Act preempted all inconsistent state regulation and that section 9(b) of that act, 16 USC § 802(b), did not preserve an independent state role in determining the requirements for a hydroelectric project. In the CWA, Congress has created an independent state role in all federal actions involving

■ That EQC erred in affirming the denial of the certificate does not resolve this case. Although the state could not deny the certificate on the grounds stated, 33 USC § 1341(d) does allow it to place limitations on the certificate if the limitations are

> "necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and with *any other appropriate requirement of State law* set forth in such certification * * *." (Emphasis supplied.)

Any limitation that the state imposes becomes a condition on any federal license or permit issued pursuant to the certification.

Although the emphasized language does not allow DEQ to consider land use and other issues outside the CWA in deciding whether to approve certification applications, it may be able to consider those factors in deciding what limitations to place on the certificate. Because the question of the relevance of land use regulations to limitations on a certificate is certain to arise on remand, we discuss it here.[5]

The legislative history of the phrase in question is minimal. The conference committee which developed the final version of the bill added it; there was nothing precisely comparable previously. The committee's report says only that under this provision "a State may attach to any Federally issued license or permit such conditions as may be necessary to assure compliance with water quality standards in that State." That statement gives little additional hint of Congress' intent. We believe, however, that there are sufficient indications of what kinds of other state requirements Congress considered "appropriate" for DEQ and EQC to use.

---

discharges into navigable waters; the question is not Congressional preemption but what criteria Congress intended the states to consider in deciding whether to issue certificates of compliance with the act.

[5] DEQ and EQC relied on the emphasized language in denying the certificate, and the parties discuss its meaning and background in their briefs. Although DEQ is incorrect in treating this provision as allowing it to deny the certificate for failure to comply with requirements outside the CWA, the language is important in determining what conditions it may place on a certificate on remand.

We look first at the purpose of the act and at what Congress could have said but did not. The purpose of CWA is "to restore and maintain the * * * integrity of the Nation's waters." 33 USC § 1251(a). Under the act, primary responsibility for determining what constitutes the integrity of the nation's waters and what is necessary to restore and maintain that integrity is with the states. The act requires the states to exercise their responsibility by adopting water quality standards under 33 USC § 1313 and to base those standards on the uses which the states wish to encourage. The specific effluent limitations and performance standards provided in other sections of the act are designed to achieve the quality standards of section 1313. Certainly, section 1313 water quality standards are appropriate limitations in determining what limits to place on a certificate.

The section 1313 standards are not, however, the only water quality standards which states may enforce; the states have inherent authority, independently of the CWA, to protect and plan the use of their waters. Congress did not make the section 1313 standards the exclusive water quality criteria which the states may use in placing limitations on section 1341 certificates. If Congress had intended to do so, it could have specifically mentioned those standards in section 1341(d), but it did not. Rather, it allowed the states to enforce *all* water quality-related statutes and rules through the state's authority to place limitations on section 1341 certificates. Congress thereby required federal licensing authorities to respect all state water quality laws in licensing projects involving discharges to navigable streams. "[A]ny other appropriate requirement of State law" is thus a Congressional recognition of all state action related to water quality and Congressional authorization to the states to consider those actions in imposing limitations on CWA certificates. It does not, however, allow limitations which are not related to water quality.

■ ■ Although it functions as a federal agent in issuing certificates of compliance, DEQ is a state agency and must comply with state law to the extent that federal law does not supersede it. That law requires DEQ to act, with respect to programs affecting land use, in compliance with the statewide land use goals and in a manner compatible with acknowledged comprehensive plans. ORS 197.180(1). DEQ therefore must

include limitations reflecting the goals and plans in section 1341 certificates to the maximum extent that the CWA allows—that is, to the extent that they have any relationship to water quality. Only if a goal or plan provision has absolutely no relationship to water quality would it not be an "other appropriate requirement of State law." In that case, and only in that case, would the CWA override DEQ's obligations under ORS 197.180(1).

 We cannot say at this point what land use provisions would relate to water quality. Many uses of land may affect water quality, even if they do not immediately result in direct discharges to the state's waters. Part of the goals and plans clearly relate to water quality—Goal 6 most obviously—but others may also have a significant, if indirect, impact. Limitations on development or on other uses of land near waters may fit into the category. The precise determination is for DEQ in the first instance. Because DEQ required a certificate of full compliance with the Deschutes County land use provisions, it did not consider the extent to which they may have related to water quality. On remand, it must examine their relationship to water quality. If it grants petitioners' request for a certificate, it must require, as a condition of that certificate, that petitioners comply with the water-related portions of the Deschutes County land use regulations. ORS 197.180(1). It must also consider the effects of the recently adopted criteria for certification, ORS 468.732, OAR 340-48-025(2)(f)(C), and of DEQ's modified procedure for determining compliance with land use plans. OAR 340-48-020(2)(i), (6)(d).[6]

██ In its cross-petition, Northwest Environmental Defense Center asserts that DEQ may not grant a certificate on any condition, because hydroelectric generation is not a designated use for that particular portion of the Deschutes River. Cross-petitioner misunderstands the role that the designated uses play in CWA's framework. 33 USC § 1313(c)(2) provides that a "water quality standard shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." The purpose of designating uses is to determine what the water quality criteria are intended to do. The purpose of those

---

[6] Of course, whether the state can enforce non-water quality-related land use requirements against a federal licensee is beyond the scope of this case.

criteria is to make the water adequate for the designated uses. They do not require that the uses of the water be limited to the ones designated. Nothing in the provision places any limitations on the use actually made of the waters, so long as the quality of the waters does not fall below that provided in the criteria. DEQ determines what uses to protect; it does not determine that other uses are forbidden. If a hydroelectric project does not degrade the water below the quality which the criteria require, and if no other water quality-related law prohibits such a project, it is irrelevant to certification under the CWA whether hydroelectric generation is a designated use. DEQ did not err in this respect.

Reversed and remanded for reconsideration on petition; affirmed on cross-petition.