No. 88-517

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

HI-LINE SPORTSMEN CLUB,

> Petitioner and Respondent,

-vs-

MILK RIVER IRRIGATION DISTRICTS,
CITY OF GILLETTE, WYOMING, et al.,

> Respondents and Appellants.

APPEAL FROM: District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Thomas Honzel, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Matthew W. Knierim; Gallagher, Archambeault & Knierim,
Glasgow, Montana   (Milk River)
Douglas E. Davidson; Berlack, Israels & Lieberman,
New York, New York   (Milk River)
Roger Tippy argued, (City of Gillette), Helena,
Montana

For Respondent:

Donald R. Marble argued, Marble Law Firm, Chester,
Montana

Submitted: October 19, 1989

Decided: February 1, 1990

Filed:

_____
Clerk

Justice John C. Sheehy delivered the Opinion of the Court.


The District Court, First Judicial District, Lewis and Clark County, sitting in judicial review of a contested case under the Administrative Procedure Act (§ 2-4-702, MCA) reversed the final decision of the State Board of Health and Environmental Sciences (Board) which had granted "401 certifications" to the Milk River Irrigation Districts and to the City of Gillette, Wyoming. The Districts and Gillette appealed the reversal to this Court. On consideration, we affirm the action of the District Court in reversing the order of the Board.

Section 401 of the Federal Water Pollution Control Act Amendments of 1972 (33 U.S.C., Section 1341) provides for a certification process to be conducted by the affected state where prospective hydroelectric projects are reviewed for compliance with the state's water quality statutes and regulations. Whatever conditions the states may place on the applicant through the certification procedure become part of the permit issued by the Federal Energy Regulatory Commission (FERC).

In Montana, the Department of Health and Environmental Sciences has been delegated the responsibility to conduct the 401 certification process. Section 75-5-401(2), MCA. Malta Irrigation Dist. v. Board of Health & Environ. (1986), 224 Mont. 376, 729 P.2d 1323.

On June 14, 1982, Montana Renewable Resources (MRR) applied to the Department of Health and Environmental Sciences (Department) for 401 certification as part of the process for obtaining a permit from FERC to construct a hydroelectric generating facility at the Tiber Dam on the Marias River near Chester, Montana. The Milk River

Irrigation Districts (Districts) filed their application on January 21, 1983, and the City of Gillette, Wyoming, (Gillette) submitted its application on February 7, 1983.

On May 14, 1984, the Department issued 401 certifications to MRR, the Districts, and Gillette. In October, 1984, MRR, by letter requested that the Department reconsider its decision to certify both the Districts and Gillette. The Department refused to reconsider. In February, 1985, MRR petitioned the Board to overturn the Department's certifications. In April, 1985, High-Line Sportsmen Club (Sportsmen) moved to intervene in the Board proceedings. On January 16 and 17, 1986, the Board conducted a contested case hearing on the 401 certification issued to the Districts and Gillette. MRR and the Sportsmen argued before the Board that the water temperature conditions contained in the certifications issued to the Districts and to Gillette violated the Board's regulations for the Marias River by allowing an increase in downstream water temperature which would endanger the existing rainbow trout fishery. The Board heard additional oral arguments on May 16, June 4, September 26, and November 14, 1986. On November 26, 1986, the Board issued findings of fact and conclusions of law and order. The Board concluded, in part, that the 401 certifications previously issued to Gillette and the Districts by the Department were to be amended to delete authorization to use auxiliary outlet level water for hydropower production at Tiber Dam.

These certifications were amended to include the following requirement:

> All water used for hydropower production is withdrawn from a point in the reservoir at least 85 feet below the elevation of the bottom of the present auxiliary outlet of Tiber Dam, or such lesser depth as is physically required by the

- 3 -

configuration of the reservoir bottom, but in no event less than 60 feet below the elevation of the bottom of the auxiliary outlet of the Tiber Dam.

It is this portion of the Board's order which Sportsmen contested, and succeeded in reversing on judicial review in the District Court. The Districts and Gillette appealed the District Court's decision to this Court.

The Marias River was named by Meriwether Lewis of the Lewis and Clark Expedition in honor of his cousin Maria Wood. Tiber Dam was finished in 1956, named for the small town nearby on the Great Northern Railway siding. The Dam backs up Lake Elwell, named in honor of District Judge Charles B. Elwell who retired from the District Court bench in 1967.

The Dam as built had not provided for the generation of hydroelectric power though the Dam's basic construction included structures which would allow for installation of generation equipment. The three entities above named became interested in hydroelectric development and each sought mutually exclusive permits from FERC to install hydroelectric plants in the Dam. Federal law requires before FERC can grant a permit, an applicant must have a 401 certification from the state which insures that state water quality standards are not violated by the proposed project. 33 U.S.C. § 1341.

It is the public policy of this state, under § 75-5-101, MCA, to conserve water by protecting, maintaining, and improving the quality and potability of water for, among other purposes, "fish and aquatic life, . . . recreation and other beneficial uses." The duty of establishing water quality standards are imposed upon the Board, under § 75-5-301, MCA. In ARM 16.20.607(4) the Board has classified the section of the Marias River involved as B-2. ARM 16.20.619(1) provides that waters classified by B-2 are those

- 4 -

suitable for growth and marginal propagation of salmonid fishes and associated aquatic life.

Since the construction of Tiber Dam, and the release of waters therefrom the Marias River below Tiber Dam provides a habitat for a sizable population of trout and whitefish. Testimony before the Department in the administrative hearing indicated that prior to the construction of Tiber Dam, fishing on the Marias River and that area was not good and that fish found were mainly "gold eyes, suckers, carp, sturgeon and catfish." After the Dam was completed in 1956, and waters were released from the Dam downstream, aided by implantation through the Department of Fish, Wildlife and Parks, the fishery was considerably improved with substantial numbers of trout, whitefish, and walleyes available for sportsmen. The reason given for the improvement of the fishery was the fact that cold waters were released downstream from the Dam which made the downstream Marias more conducive and thriving for trout, whitefish, and walleyes.

As the Dam is constructed, there are three means of water exit from the Dam and Lake Elwell. One is the overflow spillway, which is rarely used. Another is called the river outlet. Its intake is situated deep below the surface so it is reaching colder waters of Lake Elwell. A third is an auxiliary outlet whose water intake is nearer the surface of Lake Elwell approximately 85 feet above the intake of the river outlet.

The difference in elevation between the intakes for the river outlet and the auxiliary outlet are crucial to the trout fishery. In the summer season, the waters of Lake Elwell near the surface are higher in temperature than the waters well below the surface. In consequence, when waters are discharged from Lake Elwell through the river outlet, cooler waters are delivered downstream which aids the

fishery. Waters taken from the auxiliary outlet, on the other hand, are warmer and are deleterious to the fishery. Curiously, the demarcation between the warm waters and the cooler waters is remarkably defined on a profile of Lake Elwell by a thin zone of separation called a "thermocline."

The application of MRR to FERC for its hydroelectric development proposed that it would use waters taken exclusively through the river outlet. Thus it would use the cooler waters of Lake Elwell at all times and so be amenable to the downstream fishery. The applications of the Districts and of Gillette, on the other hand, proposed to use waters from the auxiliary outlet. When the concerns of the Department of Fish, Wildlife and Parks concerning the release of warmer waters to the downstream fishery became known, there were further proposals by the Districts and Gillette during the contested hearing to mix waters both from the river outlet and auxiliary outlet so as to keep the downstream water temperatures cooler.

Nonetheless, the Department originally issued 401 certifications to each of the three applicants. MRR contested the issuance of the 401 certifications to the Districts and to Gillette before the Board and at this stage Sportsmen intervened in the proceedings.

The District Court, in reviewing the contested case proceedings, found that on January 17, 1986, following two days of hearings, the Board closed the record. On May 16, 1986, the Board proceeded to allow "final oral arguments." Up to that time, Gillette and the Districts had proposed alternating flows through the river and auxiliary outlets. At the May 16, 1986 proceeding, the attorney for Gillette suggested placing a siphon 30 to 40 feet below the auxiliary outlet so as to draw up water from the cooler region of the reservoir for elevated discharge through the auxiliary

outlet. The District Court found that Gillette's application had not been amended, yet the Board gave serious consideration to the "siphon scheme." Ultimately, the Board adopted its conclusion of law no. 4, which provides:

> Construction and operation of a hydroelectric generation facility at Tiber Dam in which all water used for hydropower production is withdrawn from a point in the reservoir at least 85 feet below the elevation of the bottom of the present intake of the auxiliary outlet of Tiber Dam, or such lesser depth as is physically required by the configuration of the reservoir bottom, but in no event less than 60 feet below the elevation of the bottom of the present intake of the auxiliary outlet of the Tiber Dam, satisfies applicable water quality standards, the nondegregation requirements of the Montana Water Quality Act and Board rules and the public policy of the State of Montana.

The District Court found that "there was not a shred of evidence in the record" to support that portion of the Board's conclusion that withdrawing water from 60 feet below the auxiliary outlet of Tiber Dam satisfies applicable water quality standards, the nondegregation requirements of the Water Quality Act and the public policy of the state of Montana.

The District Court noted that in briefs submitted to it by Gillette, it was conceded that the Board's order authorizing a siphon tube to the auxiliary outlet may not be based upon competent substantial evidence of the record and could be set aside. Gillette further suggested that the Board's 401 certification order be confirmed to the extent that it would authorize Gillette to use the river outlet only. The District Court declined to do this, however, finding that the Board's conclusion of law no. 4 was clearly erroneous in view of the reliable, probative and substantial evidence on the whole record. The District Court further found that due process would be violated if the certification

could be issued without an amendment to the original applications and hearings held respecting the possibility of the use of a siphon or the river outlet.

We affirm the decision of the District Court. This is not a case where the District Court has improperly substituted its own judgment for that of the agency. Chagnon v. Hardy Constr. Co. (1984), 208 Mont. 420, 422-23, 680 P.2d 932, 933. In view of the lack of record supporting the use of the siphon, and the due process implications where the public and other parties are not given an opportunity to explore the proposal of a siphon, we obtain a definite and firm conviction that a mistake has been made. The appellant has shown prejudice from a clearly erroneous decision. Carruthers v. Board of Horse Racing (1985), 216 Mont. 184, 188, 700 P.2d 179, 181.

Gillette, however, has also contended that the issue posed in this case has become moot because of actions taken by the FERC relating to these applications and many others. On February 11, 1987, while the litigation here was in progress, the FERC issued its Order No. 464 amending its regulations to define when the certification requirements of § 401(a)(1) of the Federal Clean Water Act have been waived as a result of the failure of the state or other authorized certifying agency to act on a request for certification filed by an applicant before the Commission for a hydroelectric license. The order allowed certifying agencies one year after the certifying agency receipt of request for water quality certification to grant or deny the license applicant's request for certification. The order was made retroactive. Efforts have been made in the Congress to have FERC withdraw its retroactive application of Order No. 464, or to modify the same by granting additional time for certification. Our record does not show the final

disposition of these efforts. It does appear that the Department of Environmental Sciences takes the position that by lapse of time Montana has waived its right to certify because of Order No. 464.

It is however, not clearly established in the record that even though FERC may consider that the certifying agencies in Montana have waived the right to certify, that the decisions of a certifying agency, as modified by the courts, would have no effect on the eventual action of the FERC. In other words, the FERC, as far as the record here discloses, may yet give effect to the action of this state regarding the certifications. The eventual handling of the waiver question by the FERC, and the effect that the FERC will give to any waiver it finds, is completely within the discretion of the FERC and not foreseeable by us. For that reason, we have denied the motion to dismiss these proceedings as moot.

Sportsmen raise a final argument relating to the water certification process. Sportsmen contend that if the Board had adopted rules and regulations pertaining to water quality certifications such as here pending that the time provisions of the federal regulations applying to the state's certification process would have been observed. The District Court refused to issue a writ of mandate requiring the adoption of such rules for the reason that the District Court had before it a petition for judicial review of an administrative action, and did not have before it an action involving the issuance of writ of mandate. The District Court was correct in this regard.

The decision of the District Court is affirmed in all particulars.

_____
John C. Sheehy
            Justice

We Concur:

_____
J. A. Turnage
         Chief Justice

_____
John Conway Harrison

_____
Gene B. Daly

_____


_____
R. C. McDonough
            Justices

- 10 -

Justice William E. Hunt, Sr., concurring:


I concur in the foregoing opinion of Justice Sheehy. In addition, I would award attorney fees to respondent Sportsmen.

Sportsmen is a non-profit citizens' group with limited resources. It has acted to protect Montana's water resources when our public servant, DHES, has been unwilling to do so. To this end, it has been forced to engage in protracted litigation, oftentimes in the face of questionable tactics by appellants.

Montana is fortunate to have citizens' groups and attorneys such as these who are willing to take on public causes. They are entitled to attorney fees.

_____
Justice